UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE METAWAVE COMMUNICATIONS
CORP. SECURITIES LITIGATION

CASE NO. C02-625RSM

ORDER GRANTING DEFENDANTS
HUNSBERGER AND FUHLENDORF'S
MOTION TO DISMISS

This Document Relates to

ALL ACTIONS

This matter is now before the Court on the motion of Defendants Hunsberger and Fuhlendorf to dismiss Plaintiffs' Third Amended Complaint (Dkt. # 89)[1], a class action complaint alleging securities fraud. Senior United States District Court Judge Thomas Zilly previously granted a motion to dismiss brought by Defendants, and granted Plaintiffs leave to amend to meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Dkt. # 64 ("Order"); published as *In re Metawave Communications Corp. Securities Litigation*, 298 F. Supp. 2d 1056 (W.D.Wash. 2003). Plaintiffs filed an amended complaint, which was again dismissed by Judge

---

[1] The motion that is on the docket is a motion to dismiss the Second Amended Complaint. It was designated by the Court as a motion to dismiss the Third Amended complaint after the complaint was amended and supplemental briefing was filed.

ORDER ON MOTION TO DISMISS - 1

Zilly with leave to amend. Following a second amendment and the filing of renewed motions to dismiss, the case was transferred to the undersigned district judge.

On November 8, 2004, the Court heard oral argument on the then-pending motion to dismiss, and a parallel one filed by Defendant Victor Liang.[2] On February 14, 2005, before the Court finalized its written opinion on the pending motions, plaintiffs requested a deferral until the Ninth Circuit Court of Appeals issued a final opinion in *In re Daou Systems, Inc., Securities Litigation,* 411 F. 3d 1006 (9th Cir. 2005). The Supreme Court denied certiorari in *Daou Systems, Inc.*, on February 2, 2006. 546 U.S. 1172 (2006). In the meantime, a different Supreme Court decision led plaintiffs to move for leave to amend to conform their complaint to the "loss causation" standards articulated therein. *Dura Pharmaceuticals, Inc., v. Broudo,* 544 U.S. 336 (2005). Plaintiffs' motion was granted, the Third Amended Complaint was filed, and the court set a briefing schedule for supplemental briefing on the renewed motion to dismiss, now directed to the Third Amended Complaint ("TAC"). Dkt. ## 113, 120.

Plaintiffs filed this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5. Plaintiffs also assert a claim of controlling person liability under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). Defendants have moved to dismiss the Third Amended Complaint ("TAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), contending that it fails to cure the pleading deficiencies previously identified by Judge Zilly. Having fully considered the arguments and the memoranda of the parties, together with the Court's previous Order, the Court now GRANTS Defendants' motion.

## BACKGROUND

The background of this dispute was thoroughly set forth in Judge Zilly's Order, and will only be briefly summarized here. Defendant Metawave[3] manufactures "smart" antenna systems, used in the cellular telephone industry. The product at issue here is the Spotlight GSM Smart Antenna ("Spotlight GSM"), which uses Global System Mobile Communication technology, the standard in Europe and Asia.

---

[2] Mr. Liang's Motion to Dismiss will be addressed by the Court in a separate Order.

[3] This action has been stayed as to Defendant Metawave due to the corporation's bankruptcy.

ORDER ON MOTION TO DISMISS - 2

Metawave focused its marketing effort for the Spotlight GSM on Asian markets, particularly China. This complaint, like the ones preceding it, alleges that Metawave and the individual defendants made material misrepresentations in three areas: (1) the quality of Metawave's Spotlight GSM and demand for it in China, (2) revenue recognition from Spotlight GSM sales, and (3) inventory accounting. Thus, according to the TAC,

> [o]n April 24, 2001, the first day of the Class Period, Metawave issued a press release falsely announcing that it had earned about $1.6 million in revenue from its GSM product and an "increase in demand" for the products in Asia. For the next 11 months, defendants continued to litter the market with false statements concerning (i) the revenue and earnings attributed to purported GSM sales, (ii) the quality, performance and demand for GSM in Asia, (iii) the results of GSM field trials in China and (iv) the level of Metawave's inventory.
>
> None of these representations were true. . . . At the conclusion of the Class Period, Metawave admitted that it had falsely booked a total of $7.1 million in GSM revenues during 2001, all of which was eliminated when Metawave restated its financial results.
> . . . .
> On March 14, 2002 [the last day of the Class Period], the Company announced that due to "**insufficient customer demand** for its spotlight GSM product," the Company was shutting down the **entire GSM product line.** The Company also announced that it would (i) restate 2001 earnings due to improper recognition of revenues on sales of GSM products, and (ii) take a $23 million charge related to the discontinuation of GSM, including $18 million to write off worthless GSM inventory and fixed assets. On that news, Metawave's stock plummeted over 70%, falling below $1/share, a drop from which it never recovered.

Third Amended Complaint, ¶ ¶ 3- 4, 7 (emphasis in original).

In the ninety-five pages following these statements, Plaintiffs set out their supporting allegations. Their assertion that Defendants violated Section 10(b) and other provisions of the Securities Acts are based on a fraud-on-the-market theory. The premise of this fraud-on-the-market theory is that "the market price of shares traded on well-developed markets reflects all publicly available information." *Basic, Inc., v. Levinson*, 485 U.S. 224, 246 (1988). Buyers and sellers of stock rely on the integrity of the market price. *Id*. Thus, the Supreme Court created a rebuttable presumption of reliance by the investors on public material statements for the purposes of a rule 10b-5 claim. *Id*. at 247-48. Plaintiffs here contend that false and misleading statements in SEC filing, press releases, and conversations with analysts resulted in artificially inflated prices for Metawave's stock, to the detriment of the Plaintiff investors.

ORDER ON MOTION TO DISMISS - 3

## LEGAL STANDARDS

Defendants contend that Plaintiffs have not pleaded a claim under Section 10(b) and Rule 10b-5 of the 1934 Exchange Act. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. They argue that this TAC still fails to meet the PSLRA pleading standards, and should be dismissed under Rules 9(b) and 12(b)(6). A private action under § 10(b) and Rule 10b-5 must allege and prove all of the elements for primary liability for each defendant. The elements of a securities fraud claim are: (1) to use or employ any manipulative or deceptive device or contrivance; (2) scienter, i.e., wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases as "transaction causation"; (5) economic loss; and (6) loss causation, i.e., a causal connection between the manipulative or deceptive device or contrivance and the loss. See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

A Rule 10b-5 claim does not receive the traditional deference a court affords a complaint in resolving a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). A complaint alleging a Rule 10b-5 violation is subject not only to the heightened pleading requirements of Fed.R.Civ.P. 9(b), but also the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). *Daou*, 411 F.3d at 1014. Under Rule 9(b), the duty to plead with particularity applies only to "the circumstances constituting fraud or mistake," whereas general allegations will suffice to establish "[m]alice, intent, knowledge, and other condition of mind of a person . . . " Under the PSLRA, however, a plaintiff must "state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind," and must do so for "each act or omission alleged to violate" Rule 10b-5. 15 U.S.C. § 78u-4(b)(2) (emphasis added).

To satisfy the PSLRA in the context of a Rule 10b-5 allegation, a plaintiff must plead with particularity facts that create a "strong inference of, at a minimum, deliberate recklessness." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir.1999) (internal quotation omitted). That is, Plaintiffs must provide facts which show that Defendants knew the challenged statements were false at the time they were made. *Id*. at 985.

Under Rule 10b-5, the required state of mind is "scienter," which the Supreme Court has defined

ORDER ON MOTION TO DISMISS - 4

as a "mental state embracing intent to deceive, manipulate, or defraud." *Id*. at 975 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n. 12 (1976)). In holding that scienter requires at least "deliberate recklessness," the Ninth Circuit has expressly rejected the notion that pleading "simple recklessness" suffices. *Id*. at 977. Instead, a plaintiff seeking to overcome the PSLRA's pleading hurdle must allege "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id*. at 979. Thus, recklessness only satisfies the scienter requirement under § 10)(b) "to the extent that it reflects some degree of intentional or conscious misconduct." *Id*. at 977. If attempting to plead scienter through circumstantial evidence, Plaintiffs must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id*. at 974.

Finally, when determining if a complaint gives rise to a "strong inference" of scienter, the PSLRA requires a court to consider "all reasonable inferences to be drawn from the [plaintiffs'] allegations, including inferences unfavorable to the plaintiffs." *Gompper v. Visx*, Inc., 298 F.3d 893, 897 (9th Cir.2002) (emphasis in original). For a plaintiff pleading scienter, the PSLRA is the death knell for the "customary latitude" a court affords a complaint in considering a motion to dismiss under Rule 12(b)(6). *Id*. at 896 (noting that customary standard requires court to "accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff"); see also *Daou*, 411 F.3d at 1022 (reiterating *Gompper* ).

Where, as here, scienter and falsity are being inferred from the same set of facts, "these two requirements may be combined into a unitary inquiry under the PSLRA." *Ronconi v. Larkin*, 253 F. 3d 423, 429 (9th Cir. 2001). The effect is to incorporate the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry. *Id*. Where the pleadings are not sufficiently particularized, or where they do not raise a "strong inference" that misleading statements were knowingly or with deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6). *Id*. at 429.

## DISCUSSION

Applying these standards to the TAC, the Court finds that the amendments fail to cure the deficiencies identified in the Court's previous Order. As noted previously by the Court, this action is

ORDER ON MOTION TO DISMISS - 5

based on a fraud-on-the-market theory. Plaintiffs contend in this TAC, as in the previous complaints, that Defendants' false and misleading statements in SEC filings, press releases, and conversations with stock analysts resulted in artificially inflated prices for Metawave stock during the Class Period.

In arguing for dismissal of the TAC, Defendants Hunsberger and Fuhlendorf contend that Plaintiffs still fail to plead a fraud theory that "makes sense," because neither Defendant sold stock during the Class Period. They argue that, in the absence of a cognizable motive to commit fraud, Plaintiffs' remaining allegations fail to create a strong inference of scienter. They assert that the statements of the confidential witnesses are still vague and conclusory, and provide no basis for an inference that the Spotlight GSM was a failure, or that Defendants knew that it was. They contend that Plaintiffs' new assertions regarding revenue recognition and inventory problems have not added anything of significance to overcome the previous finding that these allegations were deficient. Finally, they contend that Plaintiffs' allegations do not meed the pleading standards for loss causation under *Dura Pharmaceuticals*. These arguments will be addressed in turn.

    A. <u>Confidential Witnesses and Scienter</u>.

It is Plaintiff's contention that there was no actual demand for the GSM system in China because it did not work, and that therefore Defendants' statements during the Class Period regarding increasing demand were blatantly false. In alleging this, the TAC, like the previous complaints, relies heavily upon the statements of confidential witnesses ("CWs") who were formerly employed at Metawave. The allegations of such CWs, if they are to contribute toward a strong inference of scienter, "must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." Order, p. 13; *quoting In re NorthPoint Communications Group, Inc. Securities Litigation*, 221 F. Supp. 2d 1090, 1097 (N.D. Ca. 2002) ("*NorthPoint II*"). Plaintiffs must plead, with "substantial specificity," how the CW's acquired the information they provide in the complaint. *Id., citing In re NorthPoint Communications Group, Inc. Securities Litigation*, 184 F. Supp. 2d 991, 1000 (N.D.Cal. 2001) ("*NorthPoint I*").

In the previous Order, the Court concluded that the complaint did not provide sufficient details as to dates of employment, or the basis of personal knowledge as to facts alleged, for eight of the nine CWs.

ORDER ON MOTION TO DISMISS - 6

Order, p. 16. In the TAC, Plaintiffs have deleted CW 9 and have provided dates of employment and a description of job responsibilities as to each of the remaining eight original CWs. The TAC also adds twelve more CWs, each of whom is also described by job title and dates of employment. These descriptions are sufficient to meet the employment identification requirements set forth in the previous Order, but Plaintiffs must still provide details on each CW's basis for knowledge of the facts he or she has alleged.

The Court previously found that the basis for CW 1's personal knowledge of inventory accounting problems, and of specific instructions given by defendant Fuhlendorf to violate generally accepted accounting practices ("GAAP"), had been adequately pled. Order, p. 14. As to every other witness, CW 2 through CW 9, the Court found that Plaintiffs failed to provide a sufficient basis for the witness's personal knowledge.[4] Thus the new allegations in the TAC must be reviewed to determine whether they overcome these shortcomings.

In ¶¶ 48 and 50 through 58 of the TAC, Plaintiffs expand their allegations regarding the decline in demand for Metawave's other products, and the resulting focus on developing the Spotlight GSM for sales in the Asian market. Both CW 7 and CW 10 state that in 2001 they attended monthly meetings at company headquarters; these were referred to as "State of the Company" meetings, and both Defendants Fuhlendorf and Hunsberger gave presentations about "the Company's performance, customer activities, financial issues, and miscellaneous topics." TAC, ¶¶ 53, 54. "CW 7 recalled several of these meetings in the summer and fall of 2001 in which Hunsberger addressed the Company's financial position and the results of GSM field trials. CW 7 stated that he/she knew Hunsberger was making false statements about GSM field trials because CW 7 had reviewed the specific field trial reports for the trials that Hunsberger cited. CW 7 confirmed that the field trials were failures." TAC, ¶ 54. However, as set forth at Note 4, CW 7 was not employed throughout the class period and had no way of knowing what happened after October 2001. Moreover, CW 7 has not established an adequate basis for stating his or her opinion that

---

[4] As to CW 7, the Court stated that "assuming that CW 7 was employed by Metawave throughout the class period", the details provided were sufficient. Order p. 15. However, the TAC establishes that CW 7 was not employed throughout the class period, but departed in October, 2001.

ORDER ON MOTION TO DISMISS - 7

the field trials were total failures. CW 7 is described as a systems test engineer "responsible for preparing, reviewing and analyzing daily and weekly GSM field trial reports during the Class Period." TAC, ¶ 29. There is no indication as to his or her seniority or position in the hierarchy of the company, and thus no confirmation that CW 7 was actually in a position to see and evaluate all of the data coming from all of the field tests. To the extent that CW 7 concluded from what he or she saw up to October 2001 that the Spotlight GSM was a failure, the TAC establishes only that it was his or her opinion, one that cannot be imputed to either Defendant without considerably more detail in the allegations. Nowhere has CW 7 stated that he or she actually reported these conclusions to Defendants, or challenged Defendant Hunsberger's statements at the meetings described in ¶ 54.

In the earlier, dismissed Consolidated Class Action Complaint ("CCAC"), Plaintiffs alleged that "[b]ased on CW 7's personal knowledge of preparing and reviewing the trial reports, he confirmed that Metawave management knew exactly what was going on with the failed GSM trials and 'blatantly lied about it.' " CCAC, ¶ 78. Significantly, Plaintiffs have not re-alleged this particular paragraph in the TAC; it has been revised to address Defendant Liang only. TAC, ¶¶ 132-133. *See also* ¶ 97. With respect to Defendants Hunsberger and Fuhlendorf, CW 7 states only that "Hunsberger visited his/her work area at least every 'couple of weeks' to ask questions about how things were going." TAC, ¶ 136. Nowhere does CW 7 describe the dates of any of these visits or their number, or allege that he or she actually spoke to Hunsberger, or told either Defendant that the Spotlight GSM was a "failure." Although CW 7 has made a number of allegations regarding the problems with the GSM system, nowhere has this witness actually connected this information with Defendants Hunsberger and Fuhlendorf. TAC, ¶¶ 72-74. Thus there is no basis for an inference, from CW 7's unsupported allegation that he or she "knew" Defendant Hunsberger was making false statements about the GSM field trials, that the statements were in fact false, and that Defendant Hunsberger was deliberately reckless in making them.[5]

Although other witnesses, namely CW 6, CW 11, CW 12, and CW 15 also describe in detail the

---

[5] CW 7 has also alleged that Defendant Liang "deliberately falsified the results of GSM field trials". TAC, ¶ 88. One inference that can be drawn from this is that Defendants Hunsberger and Fuhlendorf were misled by Liang's falsified results into making statements which they actually believed to be true. That inference would negate a finding of scienter on these Defendants' part.

ORDER ON MOTION TO DISMISS - 8

technical problems with the Spotlight GSM, their allegations are not specific as to the time period they address.  TAC, ¶¶ 75-81.  None of the allegations, either alone or in combination, actually demonstrate that the Spotlight GSM product was fatally and irretrievably defective.  Nor do they connect knowledge of the technical difficulties with either Defendant Hunsberger or Fuhlendorf.  Only one witness, CW 14, states that he or she personally informed Defendants Liang and Hunsberger of the GSM test failures; that was in August and October of 2000.  TAC, ¶¶ 105, 137.  This CW left Metawave in October 2000.  TAC, ¶ 35.  Even accepting this statement as true, the Court cannot find in it any basis for inferring that Defendants' statements regarding demand for the product made six months later, in April 2001, were deliberately reckless.  Defendant Hunsberger could have been provided different information in the intervening time.

Of all the new allegations regarding product performance and demand added in ¶¶ 121-135 of the TAC, only three relate specifically to Defendant Hunsberger, and only one mentions Defendant Fuhlendorf.  In ¶ 123, Plaintiffs allege that "Defendant Liang was in charge of all aspects of the GSM product and reported directly to Hunsberger."  TAC, ¶ 123.  This general allegation of corporate hierarchy is devoid of any specifics as to **what** Defendant Liang actually reported to Defendant Hunsberger, and fails to create an inference regarding Defendant Hunsberger's actual knowledge regarding GSM tests at any specific point in time.

The scienter allegations in ¶ 133 arise from CW 14, whose discussions with Defendant Hunsberger were, as discussed above, too remote in time to provide an inference of scienter with respect to the Class Period statements.  The final sentence in this paragraph states that "the other CWs uniformly confirmed that these same problems continued during the entire Class Period."  TAC ¶ 133.  This statement is entirely vague as to specific CWs, and also fails to allege that any of them reported the problems to either Defendant.

The allegations in ¶ 134 by CW 4, regarding meetings attended by Defendants Hunsberger and Fuhlendorf, are not new to the TAC;  the same allegations appeared in ¶ 76 of the CCAC and were found to lack the required specificity as to personal knowledge.  Order, p. 14-15.  The addition of the statement that "CW 4 knew this because he/she attended the meetings with Hunsberger" does not cure

ORDER ON MOTION TO DISMISS - 9

the problem; the allegation is still vague as to the dates and number of meetings attended, and the topics actually discussed. Like allegations in the earlier (and rejected) CCAC, this allegation "does not contain the dates of these meetings, lists of attendees of meetings, or the substance of the matters discussed." Order, p. 14.

The Court concludes that the new allegations regarding product performance and demand in the TAC, when considered together with the allegations of the CCAC, still fail to lead to a strong inference of scienter on the part of Hunsberger and Fuhlendorf. This is particularly so in light of the fact that the Plaintiffs have not, in the TAC, expanded upon their allegations with respect to a motive for these Defendants to commit fraud. Defendants Hunsberger and Fuhlendorf did not sell off their stock during the Class Period, so they would have suffered the same losses as other stockholders when the price fell. That circumstance would lead to a finding of no scienter, unless Plaintiffs can advance some other motive for committing fraud. *In re Worlds of Wonder Securities Litigation*, 35 F. 3d 1407, 1425 (9th Cir. 1994) (finding no scienter because the defendants held onto their company's stock and incurred the same large losses as plaintiffs).

In both the CCAC and the TAC, Plaintiffs described a "series of private equity offerings raising $40 million in additional financing during the Class Period." CCAC ¶ 43; TAC ¶ 47. Thus, they allege, "[t]hroughout the Class Period, Defendants were motivated to keep Metawave's stock price artificially inflated so that they could secure the additional cash they needed to keep the Company afloat." CCAC ¶ 184; TAC ¶ 259. As noted by Judge Zilly in the previous Order, the motive of raising capital is too generic to establish scienter on the part of these Defendants. Order, p. 17-18; *citing Lipton v. Pathogenesis Corp.*, 184 F. 3d 1027, 1038 (9th Cir. 2001). Plaintiffs have not added any additional allegations of motive to commit fraud in the TAC. Therefore, the TAC, like the CCAC, fails to allege a motive for fraud that would lead to a strong inference of scienter.

Plaintiffs contend in the TAC, as in previous iterations, that Defendants' statements during the Class Period regarding increasing demand for Spotlight GSM in China were false. However, "[i]t is not sufficient simply to allege that a statement was false." *Ronconi*, 253 F. 3d at 431. Under the PSLRA, to plead scienter, the complaint must allege "that the defendant made false or misleading statements either

ORDER ON MOTION TO DISMISS - 10

intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge . . . that the statement was false or misleading.' " *In re The Vantive Corporation Securities Litigation*, 283 F. 3d 1079, 1085 (9th Cir. 2002). To meet this pleading requirement, the complaint must contain allegations of "specific 'contemporaneous statements or conditions' that demonstrate the defendants knew or were deliberately reckless of the false or misleading nature of the statements when made." *Ronconi*, 253 F. 3d at 432. "It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." *Yourish v. California Amplifier*, 191 F. 3d 983, 997 (9th Cir. 1999). "Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi*, 253 F. 3d at 432.

When determining whether Plaintiffs have shown a strong inference of scienter, the Court must consider all reasonable inferences, including ones unfavorable to Plaintiffs. *Gompper v. VIZX, Inc.*, 298 F. 3d 893, 897 (9th Cir. 2002). Plaintiffs would have the Court draw the inference that Defendants deliberately and recklessly made false statements in press releases and SEC filings during the Class Period, for the purpose of inflating stock prices. However, given the lack of specificity of the CW's allegations regarding Defendants' knowledge, and especially in view of the fact that Plaintiffs have failed to articulate a viable motive for fraud, the Court finds that other inferences, such as "honest optimism," are also reasonable. Therefore the Court finds that the TAC still fails to allege specific facts conducive to a strong inference of scienter as to these Defendants' statements during the Class Period, and fails to meed the heightened pleading requirements of the PSLRA.

B. <u>GAAP Violations and Restatement of Revenue</u>.

Plaintiffs' fraud theory is also premised on their allegations that there were no actual sales of Spotlight GSM during the Class Period, but only consignment sales based on "side letters" that allowed distributors the absolute right to return the product if they could not sell it. Contrary to GAAP, these sales were booked as actual sales with recognized revenue in 2001. Then in March 2002, Metawave announced it would restate the 2001 earnings, reducing them by some $7 million, to correct this improper revenue recognition. Metawave also announced it was shutting down the GSM product line. TAC, ¶ ¶ 4-7, 189-190, 254-257.

ORDER ON MOTION TO DISMISS - 11

Plaintiffs allege that the restatement of earnings proves that the revenue recognition in 2001 was fraudulent, and promoted the Defendants' purpose of artificially inflating Metawave stock prices. Defendants assert, in opposition to this allegation, that the side letters were unauthorized and that they did not learn of them until March 2002, and then immediately acted accordingly with the revenue restatement. The restatement of revenue is not, in and of itself, indicative of fraud, as "[f]raud by hindsight is not actionable." *Ronconi*, 253 F. 3d at 430 n. 12.

In addressing these allegations in the CCAC, the Court concluded (1) that Plaintiffs failed to present details on the side letters sufficient to support their theory that all sales of Spotlight GSM were consignment sales, and (2) that Plaintiff's allegations of scienter regarding the side letters on the part of Defendants Hunsberger and Fuhlendorf were not adequately pled. In particular there was no indication from the CW statements that Defendants Fuhlendorf and Hunsberger knew of the side letters before March of 2002. Order, p. 29-30. The Court also found that the Plaintiffs' allegations of GAAP violations did not adequately establish a strong inference of scienter. Order, p. 32. The Court must now review the TAC to see if these deficiencies have been cured by amendment.

Plaintiffs' new allegations regarding fraudulent revenue recognition and the side letters appear at ¶¶ 67-69, 106-115, 123-125, and 135-140 of the TAC. Plaintiffs allege that Spotlight GSM systems were shipped to distributors in China under "side letters" that allowed them to return unsold product. This gave the appearance that GSM systems were being sold, when actually they were not. ¶ 67. CW 16, a "finance employee involved in SEC reporting from May 2001 to May 2003", states that he or she saw, in the spring of 2002, one of the side letters for "a 3Q01 multi-million dollar transaction" between Metawave and a distributor, Shanghai Bell. ¶¶ 37, 68. This would have been **after** the side letters were discovered and reported by Defendants themselves. Nowhere has CW 16 reported the actual date of the letter he or she saw, or detailed its substance. The only name CW 16 connected with the letter was Victor Liang. ¶ 68. The Court noted previously that "[i]f Plaintiffs believe these side letter agreements are so crucial to their showing of fraud, one would expect the dates and the substance of the agreements." Order, p. 27, n. 11. Because the date and details of the side letter agreement still have not been provided, Plaintiffs' allegations based on CW 16's statement do not cure the deficiencies previously

ORDER ON MOTION TO DISMISS - 12

identified.

Nor have Plaintiffs provided any new allegations indicating knowledge of the side letters by Defendants Hunsberger or Fuhlendorf prior to March 2002. The allegations of CW 4 regarding a "conditional sales agreement" memo in January of 2000 appear to address a different type of arrangement than the consignment sales allegedly created by the side letters. ¶ 135. Even if the cited e-mail indicates that Defendant Hunsberger was involved in drafting sales agreements that had a performance contingency, it does not lead to an inference of scienter on his part. Such an inference could only be drawn if Plaintiffs had alleged with the requisite specificity that (1) the GSM product was fatally defective, and (2) Defendant Hunsberger knew that in January of 2000. As shown above, they have alleged neither with the requisite specificity; indeed, according to CW 14, it was not until August of 2000 that he told Defendant Hunsberger of GSM test failures. ¶¶ 105, 133. As indicated above, Plaintiffs have not adequately established a nexus between CW 14's statements to Defendant Hunsberger in 2000 and the requisite scienter for the April 2001 positive demand statements. This conclusion would apply to the March 2002 restatement of revenue as well. Thus, Plaintiff's allegations regarding fraudulent recognition of revenue from either consignment or contingent sales have not been adequately pled.

In former iterations of the complaint, to support their contention that Spotlight GSM systems were being shipped but not sold, Plaintiffs detailed the allegations of CW 5, a "senior digital-design engineer." This CW stated that he traveled to China and Taiwan in 2001, and saw one warehouse filled to capacity with unsold GSM systems. Consolidated Class Action Complaint ("CCAC"), Dkt. # 28, ¶¶ 107-108; Second Amended Complaint, Dkt. # 85, ¶¶ 107-109, ¶ 172. These paragraphs have been deleted from the TAC, or amended to delete references to the trip to China by CW 5. In the amended paragraph the allegations are based entirely on hearsay. TAC ¶ 172. These amendments actually weaken Plaintiffs' position.

In place of the deleted paragraphs, Plaintiffs present a copy of a PowerPoint presentation showing that "most of the systems shipped to China were never deployed or operational." TAC, ¶ 109. Plaintiffs allege that this chart, "and similar documents, confirm the reports of witnesses who have stated that the vast majority of the GSM products shipped by Metawave were simply sitting in distributors' warehouses

ORDER ON MOTION TO DISMISS - 13

and not deployed, or working in the field." TAC, ¶ 110. Nowhere have Plaintiffs identified those witnesses. In the absence of the deleted paragraphs regarding CW 5's experience, there is no support other than hearsay for Plaintiffs' statement regarding the number of systems that were "sitting in warehouses" and not deployed.

Apart from the unsuccessful "side letter" and consignment sale allegations, Plaintiffs' allegations of scienter in revenue recognition rest on the alleged GAAP violations. It appears that there are two aspects to this contention. First, Plaintiffs argue that the March 2002 restatement of earnings was an admission of the falsity of the previous recognition of revenue in 2001. TAC ¶¶ 254-256. Plaintiffs also appear to assert that GAAP violations are *per se* an indication of scienter. TAC ¶¶ 120, 257-258. Both of these aspects were addressed in the Court's previous Order. The Court found that "Plaintiffs' contention that Metawave's restatement is an admission that Defendants issued false and misleading financial reports is without merit." Order, p. 31. Plaintiffs have made no new allegations or arguments on this point that would alter this conclusion. This aspect will be addressed further below, under the section "Restatement as an Admission."

As to whether the GAAP violations surrounding the restatement of revenue indicate scienter, the Court noted previously that "[s]cienter 'requires more than a misapplication of accounting principles.' " Order, p. 31-32; *citing Worlds of Wonder*, 35 F. 3d at 1426. A failure to follow GAAP, without more, does not establish scienter. *Id.*, *citing In re Boeing Securities Litigation*, 40 F.Supp. 2d 1160, 1177 (W.D.Wash. 1998). The Court found that, due to a lack of specific details regarding transactions that led to accounting irregularities, "Plaintiffs failed to adequately establish a strong inference of scienter concerning Metawave's revenue recognition based on violations of GAAP." Order, p. 32. The new allegations set forth at ¶¶ 108-115 and 123-125 are not sufficiently specific as to transactions to correct this deficiency.

Apart from the allegations addressed above, new allegations in the TAC, supporting a claim of revenue recognition fraud, are directed at Defendant Liang, and will be addressed in a separate Order.

C. <u>Accounting Irregularities</u>.

A separate allegation of accounting irregularities and false statements involves inventory.

ORDER ON MOTION TO DISMISS - 14

Plaintiffs allege in the TAC, as in the CCAC, that Defendants "overstated Metawave's reported gross profit . . . by failing to properly value its inventory at the end of 1Q01." CCAC, ¶ 175; TAC, ¶ 249. As they explain in the TAC,

> GAAP requires inventory to be valued at the lower of cost or market. This means that when inventory becomes obsolete, damaged, or otherwise non-saleable, it must be "written off" or a reserve must be established for the value of the inventory that is deemed obsolete. When inventory reserves are established, the reported inventory balance is reduced and a corresponding charge to cost of goods sold must be taken to reflect the decreased inventory value. A charge to cost of goods sold increases the reported expenses thereby reducing gross profit and net income.

TAC, ¶ 250.

Plaintiffs allege that Defendants made false statements by improperly reporting Metawave's inventory balance in two ways. First, as reported by CW 1, "at the end of 4Q00, Metawave's reported inventory balance was overstated by at least $3.7 million due to obsolete and non-saleable component parts." TAC ¶ 251. CW 1 was instructed by the Controller, "who reported directly to Defendant Fuhlendorf, to reverse this reserve. As a result of reversing the reserve, Metawave fraudulently increased its reported inventory balance and fraudulently reduced its cost of goods sold, resulting in overstated gross profit and understated net loss for 4Q00." *Id.* Second, CW 1 stated that as of December 31, 2000, Metawave's reported inventory balance was overstated by $3 million due to nonexistent inventory. TAC, ¶ 253. Plaintiffs assert that this "reporting of a fictitious inventory balance is a violation of one of the most basic concepts of GAAP . . . " *Id.*

All of Plaintiffs' factual allegations in this section appeared in the CCAC. CCAC ¶¶ 83-84, 86, 175-177. Plaintiffs' contention that Defendants overstated inventory and net profits by failing to properly reserve for the $6.7 million in obsolete and nonexistent inventory (CCAC ¶ 177; TAC ¶ 252) was fully considered and addressed by Judge Zilly in the previous Order. Order, pp. 34-39. Plaintiffs have not added any material factual allegations or new theories which would alter this Court's conclusions. The Court adopts (without restating) the analysis set forth in the previous Order, specifically the findings that (1) Plaintiffs' reliance on CW1 alone does not support a strong inference of scienter; (2) Plaintiffs' circumstantial evidence regarding concerns raised about improper accounting are not sufficiently detailed to establish a strong inference of scienter concerning the improper inventory

ORDER ON MOTION TO DISMISS - 15

accounting; and (3) the facts alleged by Plaintiffs do not establish that Defendants Hunsberger and Fuhlendorf knew that the inventory balance on the SEC filing for the first quarter of 2001 was false at the time. Order, pp. 37-39. Accordingly, the Court finds, as it did previously, that Plaintiffs fail to state a claim against these two defendants for false or misleading statements concerning inventory accounting.

### D. Restatement as an Admission

This section of the TAC refers to the March 2002 restatement of earnings that resulted from discovery of the side letters, as described above. Plaintiffs alleged in the original CCAC, as they do here in the TAC, that "Metawave admitted that its previously announced results for 1Q01 and 3Q01 were false and misleading and, as a result, has restated them to eliminate over $7 million in previously reported revenue and to increase previously reported net losses by more than $2 million." CCAC ¶ 178; TAC ¶ 254. They contend that the fact that Metawave restated its financial statements "is an admission that the financial statements originally issued were false based on information available to Defendants at the time, the results were originally reported and that the misstatement of revenues and net income was material." TAC, ¶ 256.

According to Plaintiffs, "GAAP requires a restatement to occur when the originally issued financial statements were based on fraudulent accounting practices." TAC, ¶ 257. The type of restatement announced by Metawave was for a "correction of an error in its previously issued financial statements." *Id*. Plaintiffs cite to an Accounting Principles Board Opinion, APB 20, for its definition of an "error": "mathematical mistakes, mistakes in the application of accounting principles, or **oversight or misuse of facts that existed at the time the financial statements were prepared."** TAC ¶ 257, citing APB No. 20, ¶¶ 7-13 (emphasis added). Plaintiffs have omitted further references to APB No. 20 that were in the CCAC, and substituted excerpts from an amicus brief filed by the SEC in a 2002 case, *In re Sunbeam Securities Litigation*, No. 98-8258 in the Southern District of Florida. TAC ¶ 258. The relevant language in this excerpt follows the error definition quoted above.

> In accordance with APB 20, the Commission does not condone the use of restatements by public companies or auditors to make any adjustments (particularly to judgmental reserves) to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared

ORDER ON MOTION TO DISMISS - 16

TAC ¶ 258 (quoting the SEC Amicus brief).

In addressing this allegation as it was presented in the CCAC, the previous Order noted that scienter "requires more than a misapplication of accounting principles." Order, p. 31, quoting, *Worlds of Wonder*, 35 F. 3d at 1426. The Court noted that the "mere fact of Metawave's restatement supports an inference that Defendants Hunsberger and Fuhlendorf knew the financial reports were false when issued." Order, p. 31. However, "mere 'oversight or misuse' is not the same thing as fraud and fails to establish a strong inference of deliberate recklessness." *Id.* After carefully analyzing Plaintiffs' factual allegations, the Court found that Plaintiffs' contention that the restatement is an admission of false and misleading financial reports was without merit. *Id*. This led to the Court's conclusion that "Plaintiffs have failed to adequately establish a strong inference of scienter concerning Metawave's revenue recognition based on violations of GAAP." *Id.*, p. 32. In light of the fact that the TAC has not added any new factual allegations in this area, the Court finds no basis for reconsidering or amending the previous conclusions reached by Judge Zilly.

E. Loss Causation

Following oral argument on motions to dismiss the Second Amended Complaint, plaintiffs were granted leave to amend to conform their allegations to the "loss causation" pleading standards set forth by the Supreme Court in *Dura Pharmaceuticals, Inc., v. Broudo,* 544 U.S. 336 (2005). That class action complaint alleged fraud on the market as a result of Dura's false statements about its progress in developing and gaining approvals for a medical device. The Supreme Court held that the plaintiff could not prove causation by showing only that the security price on the purchase date was inflated because of a misstatement. The Court found that the plaintiff must explain "the loss and the causal connection" and must prove that the inflated purchase price was the proximate cause of the loss. *Id.*

Plaintiffs' loss causation allegations are set forth at ¶¶ 265-268 of the TAC. The Court has reviewed these allegations and finds that they adequately provide notice to Defendants of what the relevant economic loss might be and of the causal connection between that loss and the alleged misrepresentations. *Id*. Plaintiffs' allegation of a share price drop following the March 2002 restatement meets the pleading requirement of tying the shareholder losses to a specific drop in stock price following

ORDER ON MOTION TO DISMISS - 17

a disclosure that corrected an earlier alleged misstatement. *See*, *In re Daou systems, Inc.*, 411 F. 3d 1006, 1026 (9th Cir. 2005). The "loss causation" standard therefore does not provide an additional basis for dismissal of the TAC.

## CONCLUSION

In the previous Order, the Court noted that "[w]hen the allegations in a securities fraud complaint are inadequate to establish a strong inference of deliberate recklessness, dismissal with leave to amend is the prudent course of action, unless it is clear that the pleading could not be saved by amendment." Order, p. 50. The motion to dismiss by Defendants Hunsberger and Fuhlendorf was granted with leave to amend under that standard. In the five years that have passed since the Court's prior Order, Plaintiffs have filed three amended complaints, the second and third have been considered here. The Court has found, as set forth above, that the allegations in the Third Amended Complaint do not cure the deficiencies originally identified by Judge Zilly in his June 2003 Order. As Plaintiffs have been afforded ample opportunity to conform their pleadings to the requirements of the PSLRA and have still failed, no further leave to amend is required.

Accordingly, the Court now GRANTS Defendants Hunsberger and Fuhlendorf's motion to dismiss the Third Amended Complaint (Dkt. # 89), and DISMISSES WITH PREJUDICE the claims against these two defendants.

DATED this 25th day of March 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER ON MOTION TO DISMISS - 18